Mr. McBride, please proceed. Thank you, Your Honor. I deserve three minutes for rebuttal. May it please the Court. The patent trial in the appeal board made a legal error in applying the incorrect standard for inherent anticipation in its ruling on the 779 patent. It replaced the legal standard of inevitability with a standard of reasonableness. And can you point us to where you get that, you draw that conclusion from? Yes, Your Honor. If you look at the final written decision at around page 35, which is appendix 35, that is the key section where, even though they've invoked the correct language up front, they then begin their analysis of the standard. But what about, I mean, where they not only invoke the correct standard up front, but do they invoke the correct standard elsewhere in the opinion? Yes, Your Honor, they use the correct words in their conclusions. Yeah, and then on page 41, where it's a little similarity between what was said in 35, but it says the CS2 was produced under all conditions utilized and that crystallization in all cases leads to. So there's a lot, you would agree, that there's a lot in the opinion that invokes the correct standard, the correct analysis. Yes, Your Honor. Do they rely on the one sentence on 35 that seems to say something other than that? It's the analysis that starts on 35 and goes through onto 36 into that section on their response to our argument that Dr. Bohofsky and Esai needed to actually show that if you vary the conditions you would, in fact, get the same result to get in Form CS2. Where is that on 36? It carries through, sorry, it's the sentence on 35 that we're not of the view that inherency requires a showing that Example G inevitably produces Form CS2 under all its conditions. They then go through their analysis of that and on 36 they talk about that it was appropriate for Dr. Bohofsky to pick out one or more exemplary points within the more general descriptions or ranges of parameters set forth in Example G. Well, do you disagree with that? I mean, they conclude that his experiments were probative of inherency in this proceeding because it was appropriate for him to pick out one or more exemplary points. You say that's wrong, that's error? We're not disputing that Dr. Bohofsky conducted a single experiment replicating Example G. That is probative, but it is not sufficient, Your Honor, for inherency, we would say. How many different samples were necessary? It's a very fact-dependent inquiry, Your Honor. I mean, when you take something like Example G, which has ranges for different temperatures, it has choices to be made at different conditions. I mean, the hallmark of the strict standard of inherency and showing of inevitability is you have to do replications, you have to do variations. But you don't necessarily have to do a test at every single point. Correct, Your Honor. And that's one of the places the panel went wrong. And then the question is, well, all right, if you don't have to do it for every single point, then what's appropriate? And isn't the  that it depends on the facts and circumstances as to how a person of literary skill in the art would consider reasonable? Yes, Your Honor. Isn't that exactly what the Board did? We would say they did not, Your Honor. I mean, we would say that they, in fact, said starting on 35 that they were applying the incorrect standard. And if you apply the correct standard and you say, is that one experiment for something like Example G enough, that is not substantial evidence. They weren't setting a new standard. They were just commenting on the types of proof necessary. They recited what the proper standard is several times in the opinion. They did recite the standard, but, Your Honor, we would say that given that the way that they have articulated their rebuttal to our claim that you have to actually show variation in order to show inherency, that shows that they're not applying the correct standard. I'm sorry. Okay, so for me, I looked at this case and at first I was a little troubled because what I would say, the prima facie case the Board lays out has just two tests that were performed and those two tests resulted in the CS2, but two tests doesn't seem like enough to prove always as opposed to possible or probable, and so I was a little concerned by that, but then you all introduced a test that went the other way, and I feel like there was substantial evidence that the Board articulated why your test was not performed under the right set of conditions and it was suffering all these flaws and differences, and that when they redid that test, it again produced the crystal foam and everything. And so I guess the question I have is, is there reason to think that two tests in this space isn't enough? And that's, I think I agree with you, it's very fact-dependent, but I don't know how many tests you need to prove and I certainly don't think you have to prove one at every point in the entire range. I don't think that could possibly be necessary to establish anticipation. So what's the magic number? I mean, maybe two isn't enough, but what is enough? You can't be right that the entire universe of parameters has to be tested for them to establish inherency. That can't be right. So where do we go? We're not saying you have to actually test the entire range of parameters. That is correct. You have to perform sufficient tests to show that under all possible parameters, you would inevitably get it. The answer to your question is, again, it's very fact-dependent, and I think you've zeroed in on exactly the problem here. We would actually say they only have one test for each of the two procedures, and they are two separate procedures, and that cannot be enough. You say one test because, as the Chief pointed out, we shouldn't be counting the tests that they gave on their reply to your testing? Correct, Your Honor. But what if we disagree with that? So we put all the tests into the bucket. Well, in that case, Your Honor, they would have tripled their evidence by putting in two additional tests that we simply could not rebut. And yes, Your Honor, at that point, we would be in... You say you couldn't rebut. I mean, I don't... I think that what is fair is you performed a test under conditions... I mean, you started with orange. You didn't even start with the right color. I mean, your test was really flawed. And so what they did is replicate it under the correct conditions and show that you do get the crystal. I don't see how that evidence should be excluded. It is directly rebutting your evidence. And yes, it is further confirming their prior evidence, but I don't see what the problem is with that. Well, Your Honor, we're not disputing the findings with respect to our experiments by Dr. Rogers. And in doing so, we are taking off the table the reply experiments which were rebuttal to what he did. And I would say that if you now bring them in as support for the prima facie case, you're rewarding... You can't take them off the table. You're the one that introduced a crappy set of experiments. Then they showed what was wrong with them, and it further reaffirmed their prior finding. That's on you. Like, that's... You're the one that introduced these flawed experiments and opened the door for them to introduce this other evidence. And now you're saying, okay, well, we withdraw our flawed experiments, so please don't look at their other evidence. It doesn't work that way. Yes, Your Honor, and since we are saying that, we're saying we're taking our experiments off the table by not challenging the factual findings against them. And in doing so, those reply experiments... Let's say we disagree with you on that. So let's take it off the table. The statement that you rely on, and it seems to be that this is the heart of your argument, do you think that the standard requires that the petitioner show that the entire universe of parameters with respect to within example G produce blah, blah, blah? They need to produce sufficient evidence to show it's more likely than not that's the case. But they do not need to do actual experiments at every possible point. At every possible point. So, I'm not exactly clear. It requires a showing that. So how do you do a showing that the entire universe of parameters produces this? You have to do sufficient tests that, for example, you have temperature ranges. You need to do more than one test. You need to test that range, perhaps the top and the bottom, depending on the width of the range. If you have other examples for heating or cooling to a particular point, you're going to need to do more than one test that shows at the edges and perhaps in the middle of those ranges. So your assumption was that that heating or whatever may affect the results. Yes. But those experiments that you came up with on rebuttal weren't to establish that, right? That they show a different result. I mean, the experiments that we're not bringing into the appeal were designed to try and rebut Dr. Bohofsky's work, yes. Is there anything in this record to suggest that testing at different parameters would produce a different result? There's no evidence in the record following example G or alternate example G that shows varying the parameters would or would not affect it. Am I correct? I think the board commented that the evidence that they examined suggested that it wouldn't make a difference. Changing the parameters wouldn't make a difference. Yes, Your Honor. And this is what we consider to be their flipping of the burden on us, which is that they then said that there was no evidence put in the record that other forms existed. And in doing so they discounted the evidence showing that an amorphous form existed which we think was also incorrect and shows not substantial evidence. So you're referring to the brief statement in the specification referencing an amorphous form? Yeah, it's at three places in the specification, Your Honor, yes. But it also showed that that was unstable and would I mean I don't want to read anything into this but it seemed to suggest that it was unstable and would revert to crystalline form. It did make statements about its stability but as is known in the art, amorphous forms very often aren't the most stable of forms. That is correct. But, Your Honor, I think this goes to the point, which is when you look to see what the correct standard is of inevitability. We have the single experiment replicating the example G. Nothing else. Which, again, fails the standard on its own. But added to that we have this evidence discounted by the board that it does exist an amorphous form. Can I ask why we are here? And what I mean by that is suppose that you prevail on inherency so the anticipation claim is gone. There was still obviousness here and I mean they found obviousness of claims 7 and 8. I don't see how you would have any chance of prevailing against this exact same set of facts on the obviousness inquiry. So why are you here? Why is your client here? You're not going to win on obviousness so whether you win on inherency right now or not, you're going to lose ultimately. And so why? Why are we here? Well, I would say, Your Honor, that the argument on obviousness hinged entirely on the inherency argument. It was not separately and distinctly put forward and therefore if inherency falls, anticipation and obviousness both fall. How in the world does obviousness fall? It falls because the argument was entirely predicated on the idea that you inherently get this form CS2. There was no separate argument other than that inherency aspect. Okay, but if perhaps they didn't prove that it happens every single time, they proved that in every instance in this case it happened, so why would their obviousness argument be thrown out? They have evidence, I don't understand. And I do see that in my rebuttal time, Your Honor, but very quickly I would simply say that they did not this is perhaps a formalistic aspect of the way in which their obviousness argument was presented. It was not presented in any way other than the inevitability of the inherency argument. And I don't believe there was any disagreement that obviousness fell, rose and fell on inherency as well. And since I'm into my It's okay, I'll ask them that question when they come up. Thank you, Your Honor. We ask that you reverse the board. Good morning, Your Honors. May it please the Court. This is not a polymorph case. This is nature driving the formation of the Can you start, not with your canned argument, but rather where we ended up and just tell me, what about this obviousness question? Because he is saying that the way it was pled, and I 100% appreciate that whenever you have IPRs, you as the petitioner are limited to the four corners of what you actually petition for. So, was your obviousness hinged entirely on adopting the inherency concept? Your Honor, our obviousness depended a lot on adopting the inherency concept. And we feel that the inherency concept was very strong. There is nowhere in the record that it was shown that there is any other form. You speak up a little. I'm sorry. Pardon me? You speak up a little. Sure. There is nowhere in the record that it was shown that there is any other form of Lumborexan other than personal form 2. It is inherent in the formation of this active. Well, see, you see, there's nowhere in the record it was shown that it isn't there. That is putting the burden on him. That's exactly not the way that it should be approached. It should be approached of do you, have you established? It always happens. That it is the natural result of and always happens. So the fact that nowhere in the record was it established that it doesn't always happen, that is wrong. Let me tell you, if that's what you need to prove to win, you lose. Because that's not the law. Your Honor, let me address your question. According to all the evidence in the record, CS2 is the only crystal form of Lumborexan and there are no other polymorphs. There is no credible evidence of record that the amorphous form or any other solid form of Lumborexan actually exists. As the Board acknowledged, and that's at Appendix 36, the inventors of the 779 patent did allude in the background section to having created this amorphous form by allegedly performing a different method, not monets, in another ASI prior art patent, which is a completely different procedure, different reagents, different crystallization process, and it did not show that an amorphous form was actually obtained. Notably, the expert, Dr. Rogers, who is Crystal Pharma's expert at deposition, testified that he had seen no evidence of amorphous data that was referenced in the patent either. And there is no experimental evidence of record. The problem that I'm having with this case is that the initial prima facie case included only two tests. That's it. That isn't, this is, so for me, what I'm used to seeing in these inherency cases is some scientific analysis that shows and whenever you put the baking soda in with the vinegar, you have a volcano. Like, you know, like just some scientific evidence, somebody walks me through why when you do this to this, it's always going to result in that. And we don't have anything like that here. All we have is well, we did two experiments, exactly two, one on each of the two things, and both of them turned out this way. So therefore, it's inherent. And I'm thinking, was it just Tuesday and you got lucky? I mean, how? It's not their burden to prove it never happens. It's your burden to prove it always happens. And how does two experiments get you to always? Sayona, I would posit that there is substantial evidence in the record far beyond two. There are two experiments. They were submitted in ASAI's petition. They were conducted by Dr. Biafsky. He followed two different processes within Monneth and he got crystal form 2. And the board explained this in his decision at Appendix 29. That's just two experiments. Right. The board went on to cite three internal batches, ASAI's limberexant, that were made using variations on the Monneth's process in connection with innovative new drug product, Davigo, that ASAI was selling. That's in Appendix 37, and the board explained its reliance on that evidence there. Well, explain that to me. What is its reliance on that evidence? I didn't see that in Pranavesh's case. I saw that later in the opinion in response to one of their arguments or something, but when I see Pranavesh's case, they've got exactly one paragraph. And they seem to hinge their conclusion of inherency entirely on the two tests, and they don't cite anything else other than the two tests. Until they're then, I would say, rebutting the patentee's argument. And that's my only concern is did they flip the burden here, because I don't think two tests standing alone are enough. And when I see them concluding there's inherency, I see them relying on nothing but the two tests. And so then, I see them rebutting, and, okay, so you all proved it, because you showed two tests. And I don't see them relying on all that other stuff. So, help me. Where's the one paragraph that I'm worried about? Is it 29, I think? No. What page? What page in the appendix? So I want you back to Appendix 37 in the written decision. But 29, right, is where I'm talking about. Go to page 29 first. Okay. So if we go to 29. We are persuaded by and credit the testing evidence submitted with Dr. Bohofsky's and Dr. Mayo's initial declarations in support of the petition which shows that Form CS-2 will naturally and inevitably result if a procedure follows the procedures of Example G. But it's clear that everyone agrees, there's no dispute that only two tests were performed here. Just two. So, let me point you to Appendix 37 of the final written decision, where the Board goes through other evidence that it considers probative, and I would say that there is definitely support in the record that other probative evidence can be properly considered in finding inherency. For example, in the Smith-Klein-Beacham case, Federal Circuit 2000. Wait, wait, wait. Stop. Sure. You said Smith-Klein-Beacham is not stated on page 37. You said go to page 37, so I'm now on page 37. What is it in particular you want to show me that constitutes something more than the Board's simple reliance entirely on two tests to establish inherency? Sure. So let's start at the top of page 37 where we're talking about Bergen's own Chinese patent application. There the Board states, in particular as noted by Petitioner, patent owner's own Chinese patent application discusses 20 different embodiments precipitating E-2006, and that's the internal ASI code for lemborexin, using multiple different methods, all of which resulted in crystal form 2. Then it goes on to talk about XRPD analysis of internal ASI batches. The other Board states, likewise, we've considered the evidence in showing that XRPD analysis of Petitioner's own internally manufactured lots of lemborexin from as early as 2010 show the same characteristic peaks as the claimed form CS2. Patent owner does not dispute that these other manufacturing processes from both patent owner and Petitioner also produced the claimed form CS2. Then if you look at the bottom of the page, there's third line up from the bottom, as evidence in this proceeding, it goes on, as evidence in this proceeding, Petitioner did submit its new drug application for a day ago, in which it represented that there is only one crystal form of lemborexin, no other polymorph. There is no evidence that this representation to the FDA, made before the petition in this case, was even filed, was false or misleading. So we would posit that while that is not the two experiments Dr. Biafsky conducted, the Board definitely considered that way this evidence appropriately and found it probative in properly applying the standard for inherent anticipation here. So, you did two experiments and you think that it's okay for the Board to rely on your representation to the FDA that this is the only thing that will happen. I mean, I'm just, you know, it feels a little bit biased, like maybe that isn't, I'm used to seeing scientific literature, I'm used to seeing something that feels more objective in these inherency cases. And I just don't see that here, and that's what's bothering me. I'm not saying this maybe isn't substantial evidence, but boy is it weak. Well, to address your point on the statement that ASN made to the FDA, that statement was scientifically supported. And in the submission of new drug applications that contain crystal forms, the applicant must conduct extensive polymorph screening. This was backed by scientific evidence. And this was given to the Board. The polymorph screening? No, the FDA application in which the statement was made, so that it could see the Board had in front of it how you, you're saying the application itself contained this explanation, this scientific explanation. The only thing the Board quoted is the sentence, right, which feels conclusory. But you're telling me the Board did in fact have in front of it, as part of the evidence it was considering in this case, that FDA application, which included not just the sentence, but the scientific explanation. The Board does not have the entire application in front of it. It did have the sentence, and it also had in front of it batch records, three batches that were made in connection with this NDA, that showed XRPD profiles, that the processes used there, which were consistent with MONIT, with a few variations, that also showed that those consistent processes made CRSLA Form 2. Let me ask you this, because I'm struggling with this part. A few variations. I appreciate your candor. It is so important that litigants be candid, and I really, I'm going to commend you on not overstating your case because you're actually doing a really nice job, and it gives you immense credibility quite frankly, so good for you. These variabilities are part of what I just don't understand. On page 37, which you pointed me to, when it talks about the XRDP analysis, I think that doesn't the Board want to explain that these processes are different from example G, and therefore, maybe aren't necessary, it's not like these are right on point. They may be analogous, they may be close, but they're not the same. It's not like this evidence is further evidence that when you do the exact procedure in example G, you will always get this thing. Your Honor, I think why the Board gave this evidence the way it did is because it really shows that all paths here lead to CRSLA Form 2. And that goes to Bergen's arguments, kind of picking apart what Dr. Bialksi did, saying, well, you only chose certain data points within these ranges. Our argument would be, look, you could do MONITs, you could do variations on MONITs, you could do completely different procedures, like CRSLA Form 1 did in its Chinese patent application, and you would still get CRSLA Form 2. There is no other form of limborexia that exists. Period. So all paths lead to CRSLA Form 2, and I think that's why the Board found that evidence probative. Is there any reason to think that variation was...so what you've shown is, okay, we tested it twice using exactly the two different example G things, and we got the crystal CS2. And then here's these other things that happened where it was slight variations, and it all resulted in CS2 crystallization as well. Is there any evidence at all that has ever been introduced in this case about varying parameters and, you know, whether or not that has any impact? Or are you saying that this evidence on 37 and 38 kind of goes exactly to that point that there was, in fact, evidence of record that even though you are varying some of the parameters, you're still getting CS2? Is that... what are your thoughts on that? I'll answer that in two parts. So I think the evidence of record does show even if you vary these parameters, even if you do completely different processes, like Bergen did in his Chinese priority application, you still get crystal form 2. And I would also like now to mention the reply experiments that the board credits on appendix 24, where Dr. Biafsky did do additional variations within monads. And of course that was in response to the failed experiments of Bergen's own expert. Dr. Biafsky repeated those experiments. He used the right beginning material. It was off-white. It wasn't orange. He did two experiments tracking what Dr. Rogers did, and then he did two additional experiments to kind of address what might have been flaws in Dr. Rogers' methodology. For example, Dr. Rogers used a lot of filter material. It might have captured all the limber excess. So in the end, there wasn't much left to solidify. So it was two additional experiments... So you all believe you asserted and even though maybe I think the record is a little sparse, you established that all roads lead to CS2 and crystallization. And then they said, no it doesn't. And then you're like, really? It doesn't? Let us do five different experiments and vary a bunch of things and all roads lead to crystallization. That's correct. And so now they would like to discount your rebuttal evidence entirely because we withdraw our claim that ours didn't. But I mean, I just don't think it works that way. I don't think your rebuttal evidence could exist to fulfill your initial burden. But I think it could certainly further bolster your burden in response to their arguments about varying parameters or insufficient numbers or that kind of thing. Yes, I agree. We're not relying on that to make out the prima facie case, but we do see this additional bolstering evidence, probative evidence, supplemental evidence that all paths lead to crystal form 2. Did the board rely on the rebuttal evidence in a way that suggests it was sort of part of the date? Because apparently if I read you, it seemed to me like they were just looking at these two experiments full stop. And so I didn't really sense that they used the rebuttal evidence as what I would say is to meet your prima facie case. Yes, that's correct. They actually expressly stated they were not relying on the rebuttal evidence as part of the prima facie case. If you look at appendix 40, footnote 12, I think that's a very important statement there where the board states our overall conclusion would not change even if we were to disregard the additional experimental evidence submitted with petitioner's reply. So to your point, Your Honor, they did view that as additional probative evidence, supplemental evidence that kind of addressed that concern that Bergen was waving about just two experiments. We would posit there are far more in two in this record that gives substantial evidence to support the board's finding. I think you're good. Thank you very much, Counselor. Why don't we give Mr. McBride his medal time. Thank you very much. First, Your Honor, on the obviousness point, I just want to point to appendix page 41 where at ground two, which was the main obviousness point, the board said we do not address the merits of this ground in view of our conclusion that claims 1 to 4 are anticipated. So I would argue, as I said before, that the obviousness point rises and falls entirely on the basis of whether or not you find inherent anticipation. I would also point out, Your Honor, that at the end of the day, where we are, under the correct legal standard, there simply is insufficient evidence to satisfy their burden of proof. This idea that all roads lead to form CS2 is simply a misnomer. I mean, first of all, we know that they don't all lead to CS2 because we have the evidence that there is an amorphous form. No. See, that's just not right. This is a substantial evidence standard of review. What you just said was 100% true when you were before the board. But before us, you can't just point to contrary evidence and say that overcomes the substantial evidence in the case. You have to prove to me there isn't substantial evidence. Not that there existed some evidence that would have supported a different outcome. Your Honor, on the idea that there is not substantial evidence, I would say that it rises and falls on whether or not you consider that single experiment, replicating Example G, to be enough. We would say it does not, especially in light of the other evidence showing that, in fact, there is an amorphous form. But specifically to this point that came up at the end, this idea that the reply experiments as well as the internal batches are somehow showing variations on the Monitz Example G is that if you look at Appendix 36, which is starting that section, they are describing these as, in fact, widely varying methods of precipitating lemborexan. So these are not informative of what is happening with Example G. But that was in response to your argument that where they quoted at the top, the entire universe of parameters must be tested. So, I mean, I think that at a minimum, their response is to your argument. It is in response to our argument, Your Honor, but this idea that this is a road leading to Form CS2, according to Example G, or Alternate Example G, is simply wrong. These are roads, different roads. They're not the roads we are looking for here. Example G and Alternate Example G are the roads to be traveled, and on those roads, there is only that single experiment. And that's what we think we're using. But what about the entire universe of parameters that you argued had to be tested? Tell me what those parameters are. In Example G and Alternate Example G, there are temperature ranges in the coupling reaction. Reaction has to be monitored to completion for at least 20 to 24 hours. Alternate Example G also has additional reagents being added in order to show when the reaction doesn't go to completion, a reactant called HATU, a reactant called fluoropyridine. The concentration in the extraction has to be done under reduced pressure to a minimum stirable volume. That is a general term that can be varied. There's no specific parameter there. And the isolation itself requires heating in no more than 50 degrees to achieve a clear solution, along with the n-heptane being added slowly with agitation. These are all critical process parameters that would be varied by a person of skill in order to show inherency. And I see I'm over my time, Your Honor, so I apologize. But we ask that you reverse the board. I thank both counsel. The argument was helpful. This case is taken under submission.